**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| DAVID BOND and REBECCA BOND, | ) | |
| individually and on behalf of others | ) | |
| similarly situated, | ) | |
| | ) | No. 2:15-cv-04236-NKL |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LIBERTY INSURANCE CORPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiffs David and Rebecca Bond move for class certification. [Doc. 50]. The motion is granted.

## I.     Background

In April 2014, the Bonds' home sustained hail damage, and they submitted a claim for coverage to Defendant Liberty Insurance Corporation. The Bonds made their claim under the section of their Liberty Mutual policy that provided for an "actual cash value" payment for damages prior to reimbursement for repair or replacement. The dispute in this case involves Liberty's assessment of a $1,522 deductible on the Bonds' actual cash value claim, which the Bonds contend should not have been assessed under the terms of the policy.

### A.  The Insurance Policy and Liberty's General Claims Handling Procedure

Liberty's homeowner's insurance policies are generally made up of three components: the declarations, the base policy language, and the endorsements. These sections work together to define the parameters of the policyholder's coverage. The declarations set out the limits on recovery under the policy, list the endorsements included in the policy, and note the deductibles

that may be assessed under the policy. The base policy language contains the standard terms of the policy. The endorsements contain additions to the policy which customize the coverage and terms of the base policy language to create the specific coverage purchased by the policyholder. The terms of the endorsements control over conflicting provisions in the declarations or base policy language. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. Ct. App. 2009).

When a homeowner sustains damage to their dwelling or other structure that is covered by a Liberty Guard Deluxe Homeowners Insurance Policy, the claim is handled and paid in two phases: (1) the actual cash value ("ACV") phase and (2) the replacement cost value ("RCV") phase. [Doc. 51-1]. This procedure is set out in the base policy,[1] which provides as follows:

| SECTION I – CONDITIONS |
| --- |

. . .

> 3.  Loss Settlement.    Covered property losses are settled as follows:
> . . .
>> b.  Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:
>>> (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:
>>> . . .
>>> (4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.
>>> . . .
>>> (5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You

---

[1] The Bonds seek to certify a class of members insured under policy HO 03 (Edition 04 09). Nothing in this order addresses base policy language in any other version of a Liberty policy.

> may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

[Doc. 51-3, p. 13-14 (Bond Policy)]. Most policyholders hold base policies supplemented by a variety of endorsements which provide expanded coverage beyond that which is provided in the base policy.

After the policyholder makes his or her claim, an adjustor goes to the location of the insured property to ascertain the damage. The adjustor then uses a program called "Xactimate" to put a dollar figure on the amount of the damage. The total amount of the loss is referred to as the "replacement cost." [Doc. 51-1, p. 6 (Summerlin Depo. p. 145)]. After the total amount of the loss is calculated, the adjustor inputs factors for depreciation, and the amount of depreciation is subtracted from the replacement cost to give the actual cash value of the loss. *Id.* at 6-7. Following this calculation, the policyholder is paid the ACV of the loss, minus the deductible.[2] No further payment on the claim is made unless the insured decides to repair or replace the damage to the property. The insured is not required to undertake this repair, but may take the ACV payment in satisfaction of their claim. *Id.* at 8-9. If the insured decides to repair or replace the damage and submits proof of the repairs to Liberty, the insured is entitled to recover the RCV. If the policyholder chooses to make a claim for the RCV, a separate check is written to the policyholder to compensate them for the cost the policyholder actually spent above the ACV to repair or replace their loss to account for the amount of depreciation withheld from the ACV.

**B. The Bonds' Policy**

The Bonds' policy is made up of the declarations, the base policy language, and the endorsements. The Bonds' insurance policy includes two relevant endorsements. First, it

---

[2] The propriety of the assessment of this deductible is what is disputed in this lawsuit.

contains a Home Protector Plus Endorsement, which has its own "loss settlement" provision that

provides:

> ### HOMEPROTECTOR PLUS ENDORSEMENT
> . . .
> **B.     REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**
>
> You must meet the following additional Section I Condition for this provision to apply:
>
> 17.  Additions or Changes to Dwelling – Notice to Company.  You must inform us within 90 days of the start of any additions, alterations, or improvements to the dwelling that will increase the replacement cost of the dwelling by $5000 or more.
>
> If you meet Condition 17, then Section I, Condition 3. Loss Settlement, is deleted and replaced by the following:
>
> 3. Loss Settlement.  Covered property losses are settled as follows:
>
> > a.   The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:
> > (1) We will pay the cost of repair or replacement, but not exceeding:
> > . . .
> > (3) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.  Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.
> > . . .
> > d.   You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 51-3, p. 23].   Where it applies, this loss settlement provision replaces the loss settlement

provision present in the base policy language.

The Bonds' policy also contains a Windstorm or Hail Deductible Endorsement, which

states:

> ### WINDSTORM OR HAIL DEDUCTIBLE – DWELLING

> The following special Deductible is added to the policy:

For the premium charged, we will pay only that part of the total of covered direct physical loss to property covered under Section I of this policy caused by Windstorm or Hail that exceeds the Windstorm or Hail Deductible as shown on the Declarations as follows:

**A.   When this Windstorm or Hail Deductible Applies**
This Deductible applies in the event of direct physical loss to property covered under this policy caused directly or indirectly by the perils of Windstorm or Hail.

If this policy includes a Hurricane Deductible endorsement that is applicable to a loss, this Windstorm or Hail Deductible endorsement will not apply to that loss.

**B.  How the Windstorm or Hail Deductible Amount is Determined**
The Windstorm Deductible may be either a fixed dollar amount or percentage based, but not both.  If percentage based, the amount of the applicable Windstorm or Hail Deductible shall be determined by multiplying the Coverage A limit of liability as shown in the Declarations by the Windstorm or Hail Deductible Percentage amount as shown on the Declarations.
. . .
If no Windstorm or Hail Deductible Percentage is shown on the Declarations, the amount of the applicable Windstorm or Hail Deductible shall be the dollar amount for the Windstorm or Hail Deductible as shown on the Declarations.

**C.  Other Deductibles**
If the Windstorm or Hail Deductible amount under this endorsement is less than the base policy Section I Deductible as shown on the Declarations, the base policy Section I Deductible shall apply.

This endorsement does not provide additional insurance.  All other provisions of this policy apply.

[Doc. 51-3, p. 42].

After the Bonds sustained hail damage to their home in 2014, they submitted a claim to Liberty under their policy.  Liberty subsequently provided them with an ACV payment for their loss pursuant to the Wind/Hail Endorsement.  Subtracted from the ACV payment was a $1,522 deductible for the claim.  The amount of this deductible appeared on the declarations page of the

Bonds' policy. The Bonds never requested that Liberty supplement this ACV payment with an RCV payment, and to date have only retained compensation for the initial ACV payment.

### C. The Proposed Class

The Bonds filed this suit on behalf of a class. Prior to filing the pending motion, the Bonds moved to bifurcate the class action into an initial Rule 23(b)(2) phase followed by a Rule 23(b)(3) phase. Liberty did not oppose the motion, which the Court granted, ordering:

> A revised scheduling order will be entered limiting the existing deadlines to the proposed Rule 23(b)(2) class only. Discovery and motions relevant to the proposed Rule 23(b)(3) class will be determined in a separate phase of litigation.

[Doc. 36]. As this case is currently in the initial Rule 23(b)(2) phase, the Bonds assert that their proposed class qualifies under Rule 23(b)(2). The Bonds' theory is that by certifying a 23(b)(2) class, the Court can determine Liberty's liability under its insurance policies first, after which the Court can consider certifying a 23(b)(3) monetary damages class premised on its previous liability determination. The Bonds do not seek any monetary relief on behalf of their proposed 23(b)(2) class and argue certifying this class first will economize judicial resources.

Specifically, the Bonds seek certification of a Declaratory/Injunctive Class of Liberty property insurance policyholders in Missouri, defined as:

> All persons with a dwelling or other structure located in the state of Missouri insured by Liberty Insurance Corporation under policy Form HO 03 (Edition 04 09) and endorsements at the time of class certification **and/or** all persons insured by Liberty Insurance Corporation who incurred physical loss or damage to their dwelling or other structures located in the state of Missouri from April 20, 2009 to the date of class certification arising under policy Form HO 03 (Edition 04 09) and endorsements. Excluded from the Class are: (1) Liberty Insurance Corporation and its affiliates, officers, and directors; (2) Members of the judiciary and their staff to whom this action is assigned; and (3) Plaintiffs' Counsel.

The relief sought for the declaratory/injunctive class includes (1) an order interpreting the subject policy language and declaring that Liberty's application of deductible to ACV payments is improper, and (2) a permanent injunction requiring Liberty to stop applying deductibles to ACV payments under the policy. [Doc. 51, p. 14].

## II.     Discussion

### A.     Article III Standing

Liberty argues preliminarily that the Bonds lack standing to seek injunctive relief because they do not face an imminent threat of future injury. According to Liberty, because the Bonds lack standing to seek an injunction, they cannot seek declaratory relief, and their motion for certification under Rule 23(b)(2) must be denied.

A plaintiff must demonstrate standing separately for each form of relief sought, whether it be for injunctive relief or declaratory relief. *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 956 (8th Cir. 2015) (citing *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)).

#### 1.     Standing for Injunctive Relief

The Bonds seek a permanent injunction requiring Liberty to stop applying deductibles to ACV payments under the policy. [Doc. 51, p. 14]. "Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc). To have Article III standing to seek injunctive relief, the plaintiffs must show they are likely to suffer an imminent threat of a future injury. *Elizabeth M. v. Montezez*, 458 F.3d 779, 784 (8th Cir. 2006). A plaintiff's past injuries are not enough to give standing to obtain injunctive relief to protect third parties from similar harms. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (stating that in a claim

for injunctive relief, "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy").  In order to establish standing to seek an injunction, the plaintiff must face an injury that is "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).

"Time and again the Supreme Court has reminded lower courts that speculation and conjecture are not injuries cognizable under Article III." *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1031 (8th Cir. 2014) (*citing Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013)).  In *Clapper*, the Supreme Court further clarified the point where an injury becomes too speculative. The plaintiffs in that case—a collection of legal and human rights organizations— sought to challenge Section 702 of the Foreign Intelligence Surveillance Act of 1978, which allows the federal government to conduct surveillance on certain individuals outside of the United States. The plaintiffs argued that they could establish injury-in-fact because they regularly communicated with colleagues and clients located abroad, some of whom were likely targets of surveillance, and the statute forced them to implement burdensome security measures to protect the confidentiality of these communications. *Id*. at 1146.

The Supreme Court disagreed and held that the plaintiffs' alleged injury was not "certainly impending."  *Id*. at 1148.  Rather, according to the decision, this injury "relie[d] on a highly attenuated chain of possibilities:" it required an assumption that the government was surveilling the plaintiffs' communications, that this action was being conducted under the challenged statute, and that sensitive communications would actually be intercepted.  The Supreme Court emphasized that these assumptions were not based on "specific facts" but instead "rest[ed] on speculation about the decisions of independent actors." *Id*.

Liberty contends that the Bonds' risk of future injury is too speculative to confer standing. As support, Liberty cites evidence that the Bonds have a less than six percent chance of experiencing a future injury: future property damage covered under their Liberty policy, which would be required for them to suffer the alleged underpayment of a future ACV claim. In sharp contrast to *Clapper*, however, the Bonds' alleged injury does not rely on a highly attenuated chain of possibilities or require speculation about the decisions of independent actors. Instead, the Bonds have already suffered the alleged injury once with the underpayment of their hail damage claim, and they are likely to suffer it again in the future if their property is damaged by a peril covered by their Liberty policy because they still maintain their homeowners policy with Liberty.

Unlike in *Clapper*, the Bonds' standing is based on specific facts. For instance, the Bonds' alleged future injury would arise from Liberty's underpayment of a future ACV claim for covered property damage. Specifically, the Bonds allege that Liberty would improperly subtract their deductible from their ACV payment. There is no dispute that this was Liberty's past practice and continues to be its present practice for paying out ACV claims under its policy. If the Bonds' risk of future property damage were so speculative and conjectural that it did not confer standing, it is difficult to understand the need for Liberty's insurance policy, which the Bonds and other putative class members purchased to protect themselves from such an injury. For the previous reasons, the Bonds' risk of alleged harm is sufficiently imminent to confer standing to seek injunctive relief.

Liberty's reliance on *Thompson v. State Farm Fire and Casualty*, 2016 WL 2930958 (M.D. Ga. May 19, 2016), does not require a different outcome. In *Thompson*, plaintiff insureds moved for certification of a class of homeowners insurance policyholders who sought a

declaratory judgment regarding the scope of their insurance coverage and a corresponding injunction. *Id.* at *1. The district court determined the plaintiffs lacked standing to bring either an action for declaratory judgment or injunction because they failed to satisfy what the court deemed to be the appropriate "probabilistic-injury standard." *Id.* Denying the plaintiffs' motion to reconsider, the court again found that the mere possibility that the plaintiffs' townhouse might suffer damage in the future requiring payment under the defendant's policy was too remote, and the court rejected plaintiffs' statistical 10 percent chance of future property damage as an insufficient risk of injury to confer standing. *Id.* at *3.

Liberty, however, has not provided any binding authority showing that the probabilistic injury theory relied on by the *Thompson* court is the appropriate standard, and the Court is unaware of any other authority following this line of reasoning. Instead, *Thompson* is the only authority supporting Liberty's argument, and as an unreported district court decision, it is not binding on this court. *Ctr. for Family Med. v. United States*, 614 F.3d 937, 942 (8th Cir. 2010) ("One district court is not bound by the decision or reasoning of another district court involving other parties with the same issue."). The Supreme Court's decision in *Clapper*, as discussed above, provides sufficient guidance on which this Court bases its conclusion that the Bonds have standing. Furthermore, the Bonds now own a policy that is less valuable because of Liberty's interpretation of the policy. Using statistical probability calculations based on likelihood of future property damage fails to take into account the increased risk the Bonds are exposed to now as a result of Liberty's interpretation.

Liberty also cites a Southern District of California case in support of its lack of standing argument. However, this case is easily distinguishable because of the Bonds' status as current policyholders. *See In re: First American Home Buyers Protection Corporation Class Action*

*Litig.*, 313 F.R.D. 578, 611-12 (S.D. Cal. 2016) (denying certification for (b)(2) class because of lack of standing where the named plaintiffs did not currently have defendant's insurance plans, nor allege that any of them intended to renew defendant's insurance policy in the future).

Although the Court has established that the Bonds have standing to seek injunctive relief, the Court must also consider the standing of the proposed class members. "A district court may not certify a class if it contains members who lack standing . . . [because] [i]f members who lack the ability to bring a suit themselves are included in a class, the court lacks jurisdiction over their claims." *In re Zurn Pex Plumbing Products Liability Litig.*, 644 F.3d 604, 616 (8th Cir. 2011). Liberty argues that the proposed class definition includes members who have no standing to seek injunctive relief because they are not currently insured by the subject policy and were merely policyholders in the past. Former policyholder members will not suffer future injury that would be remedied by the injunctive relief unless they were to renew their insurance policies with Liberty. *See, e.g., Elizabeth M. v. Montez*, 458 F.3d 779, 784 (8th Cir. 2006) (former patient class members who no longer resided at the facilities lacked standing to seek injunctive relief because they were not likely to suffer future injury unless they were recommitted); *In re: First American Home Buyers Protection Corporation Class Action Litig.*, 313 F.R.D. 578, 611-12 (S.D. Cal. 2016) (named plaintiffs lacked standing to seek injunctive relief for (b)(2) class because they did not currently have defendant's insurance policy, nor allege that they intended to renew defendant's insurance policy in the future).

The Bonds' proposed class is defined to include both past and current policyholders. As stated previously, the Bonds propose the following class definition:

> All persons with a dwelling or other structure located in the state of Missouri insured by Liberty Insurance Corporation under policy Form HO 03 (Edition 04 09) and endorsements at the time of class certification and/or all persons insured by Liberty Insurance Corporation who incurred

physical loss or damage to their dwelling or other structures located in the state of Missouri from April 20, 2009 to the date of class certification arising under policy Form HO 03 (Edition 04 09) and endorsements. Excluded from the Class are: (1) Liberty Insurance Corporation and its affiliates, officers, and directors; (2) Members of the judiciary and their staff to whom this action is assigned; and (3) Plaintiffs' Counsel.

Therefore, to address Liberty's standing argument, the Court can simply divide the Bonds' proposed class into an injunctive relief subclass limited to current insureds and a declaratory relief subclass comprised of both current and former insureds. *See* Fed. R. Civ. P. 23(c)(5) ("[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule."); *see also*, Newberg on Class Actions § 7:30 (5th ed.). Accordingly, the Court certifies the following subclasses:

(1) **Injunctive Relief Subclass:** all persons with a dwelling or other structure located in the state of Missouri insured by Liberty Insurance Corporation under policy Form HO 03 (Edition 04 09) and endorsements at the time of class certification.

(2) **Declaratory Relief Subclass:** all persons insured by Liberty Insurance Corporation who incurred physical loss or damage to their dwelling or other structures located in the state of Missouri from April 20, 2009 to the date of class certification arising under policy Form HO 03 (Edition 04 09) and endorsements.

Like the Bonds who both suffered a loss to their property in the past and are also currently insured under the policy at issue, there will be class members who belong to both the injunctive and declaratory relief subclasses. However, there is no standing problem for class members seeking injunctive relief because those classmembers are, by definition, current insureds at the time of class certification.

Following its challenge to the Bonds' standing to seek injunctive relief, Liberty additionally asserts that the Bonds cannot satisfy the four requirements for an injunction. [Doc. 54, p. 8-11]. Specifically, Liberty contends that the Bonds have not pled and/or cannot establish (1) that they "suffered an irreparable injury" and (2) that monetary damages are inadequate to

compensate for their injury. The Court rejects this argument as premature. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974). Although "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," a court has no "authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982); *Eisen*, 417 U.S. at 177. Liberty's argument may be relevant to a future motion to dismiss or motion for summary judgment, but this argument has no impact on the availability of class certification, as it does not go to any of the Rule 23 class certification requirements discussed below.

### 2. Standing for Declaratory Relief

Although Liberty does not directly challenge the Bonds' standing to seek declaratory relief, the Court nonetheless considers it. The Bonds seek an order declaring the contractual requirements for the adjustment and payment of dwelling and other structural damage claims paid out under Liberty's insurance policy. To demonstrate standing to seek declaratory relief, a plaintiff must "demonstrate that he has suffered [an] injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *County of Mille Lacs v. Benjamin,* 361 F.3d 460, 463 (8th Cir.2004) (quoting *Bennett v. Spear,* 520 U.S. 154, 162 (1997) (internal quotation marks omitted)). The Bonds allege that they suffered an injury traceable to Liberty's actions: Liberty improperly subtracted the Bonds' deductible from their ACV payment in violation of their insurance policy. Further, the Bonds' alleged injury can be redressed by a declaratory judgment in their favor,

declaring Liberty's actions to be improper under the insurance policy. Accordingly, the Bonds have standing to seek declaratory relief.

Liberty further contends that without injunctive relief, the Court cannot certify the Bonds' (b)(2) class for *only* declaratory relief. Because the Court has already found that the Bonds have standing to seek injunctive relief, this argument is irrelevant. Still, even considering this argument, the Court rejects it. Even if the Bonds did lack standing to seek injunctive relief, the Court could still certify the Bonds' (b)(2) class for declaratory relief, only. *See, e.g.,* Wright & Miller, § 1775 Class actions for Injunctive or Declaratory Relief, 7AA Fed. Prac. & Proc. ("Because of the close nexus between injunctive and declaratory relief, it is quite common for parties seeking a declaration of their rights also to include a request for an injunction. But the rule does not require that both forms of relief be sought and a class action seeking solely declaratory relief may be certified under subdivision (b)(2)."); *see also, Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402 (6th Cir. 2012) (certifying (b)(2) class for declaratory relief only where plaintiffs sought order declaring the proper interpretation of the phrase, "actual charges," in their life insurance policies).

Liberty relies on *Jalili v. Am. Family Mutual Ins. Co.*, 2016 WL 3566252 (W.D. Mo. June 27, 2016), but this case is distinguishable from the Bonds' case. In *Jalili*, this Court denied as futile plaintiffs' motion to amend to add a (b)(2) class and plaintiffs' motion to bifurcate. *Id.* at *1. The Court reasoned that the defendant insurance company had recently changed its policy language so that any claim for injunctive relief would be moot, and certifying a (b)(2) class without injunctive relief was inappropriate. *Id.* at *2-3. In contrast to *Jalili*, however, Liberty's policy language and practices remain the same as when the Bonds filed their lawsuit. Therefore, the injunctive and declaratory relief sought by the Bonds is not moot, as it was in *Jalili*.

For the previous reasons, the Bonds have Article III standing to seek declaratory and injunctive relief. Further, even if this Court later finds that the Bonds cannot seek injunctive relief, their (b)(2) class seeking declaratory relief only may still be certified.

**B.  Class Certification Standard**

Under Federal Rule of Civil Procedure 23, a motion for class certification involves a two-part analysis. First, under Rule 23(a), the proposed class must satisfy the requirements of "numerosity, commonality, typicality, and fair and adequate representation." *Luiken v. Domino's Pizza, LLC,* 705 F.3d 370, 372 (8th Cir. 2013). Second, the proposed class must meet at least one of the three requirements of Rule 23(b). *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013).

As already discussed, the Court previously bifurcated the class action into an initial Rule 23(b)(2) phase to be followed by a Rule 23(b)(3) phase. [Doc. 36]. Because this case is currently in the initial Rule 23(b)(2) phase, the Bonds move for certification under this Rule only. The Bonds' theory is that by certifying a 23(b)(2) class, the Court can determine Liberty's liability under its insurance policies first, after which the Court can consider certifying a 23(b)(3) monetary damages class premised on its previous liability determination. The Bonds do not seek any monetary relief on behalf of their proposed 23(b)(2) class.

As plaintiffs, the Bonds carry the burden to show the class should be certified. *See Luiken,* 705 F.3d at 372. This burden is met only if, "after a rigorous analysis," the Court is convinced the Rule 23 requirements are satisfied. *Comcast,* 133 S.Ct. at 1432 (quoting *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551–52 (2011)). In the Eighth Circuit, the rigorous analysis includes examining whether the proposed class is "adequately defined and clearly ascertainable." *Sandusky Wellness Center, LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 996 (8th

Cir. 2016) (citing *Ihrke v. N. States Power Co.,* 459 F.2d 566, 573 n.3 (8th Cir. 1972)). Rigorous analysis may further "entail some overlap with the merits of the plaintiff's underlying claim," because "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal–Mart,* 131 S.Ct. at 2551–52 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982)). District courts have broad discretion in deciding whether class certification is appropriate. *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski,* 678 F.3d 640, 645 (8th Cir. 2012) (citing *Rattray v. Woodbury Cnty, Iowa,* 614 F.3d 831, 835 (8th Cir. 2010)).

As to the ascertainability requirement, the Eighth Circuit in *Sandusky*, 821 F.3d 992, recently explained that whether the proposed class is clearly ascertainable is a question that must be answered as part of the rigorous analysis performed under Rule 23. However, the Eighth Circuit has not "outlined a requirement of ascertainability" or treated ascertainability "as a preliminary requirement." *Id.* at 996. "'It is elementary that in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.'" *Id.* (quoting *Ihrke v. N. States Power Co.,* 459 F.2d 566, 573 n.3 (8th Cir. 1972), *vacated due to mootness*, 409 U.S. 815 (1972)). Therefore, ascertainability is addressed below in connection with Rule 23's explicit requirements, rather than as a stand-alone requirement.[3]

### C. Rule 23(a)

#### 1. Numerosity

Rule 23(a)(1) requires that the class be sufficiently numerous such that joinder of all members would be impracticable. In assessing whether the numerosity requirement has been met, courts examine factors such as the number of persons in the proposed class, the nature of

---

[3] Liberty does not contest that the proposed class is ascertainable.

the action, the size of the individual claims, and the inconvenience of trying individual claims. *Paxton v. Union Nat'l Bank,* 688 F.2d 552, 561 (8th Cir. 1982). Liberty does not contest that numerosity is satisfied.

Approximately 22,000 policies containing Form HO 03 (Edition 04 09) are currently in effect in the state of Missouri. [Doc. 51-5, p. 1]. More than 8,000 claims for physical loss or damage to dwellings arising under this policy form have occurred during the class period. [Doc. 51-5, p. 3]. The size of the individual claims would make individual suits impracticable. Numerosity is satisfied here.

## 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A plaintiff must show that the claims "depend upon a common contention" that "is capable of class wide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal– Mart,* 131 S.Ct. at 2551. But, commonality "'does not require that every question of law or fact be common to every member of the class . . . and may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated.'" *Downing v. Goldman Phipps PLLC,* 2015 WL 4255342, at *4 (E.D. Mo. July 14, 2015) (quoting *Paxton,* 688 F.2d at 561). Commonality is easily satisfied in most cases. *See Wineland v. Casey's General Stores, Inc.*, 267 F.R.D. 669, 674 (S.D. Iowa 2009) ("The burden imposed by [the commonality] requirement is light and easily met in most cases.") (citing *In re Hartford Sales Practices Litig.*, 192 F.R.D. 592, 603 (D. Minn. 1999) and Newberg on Class Actions § 3:10 (4th ed.)).

Commonality is satisfied here. The Bonds seek to certify a class of plaintiffs who are

insured under the policy at issue and/or who suffered loss or damage to their property insured by the policy at issue—a policy under which Liberty admits that it applies deductibles to ACV claims. Thus, all class members' claims revolve around the same question of whether Liberty's admitted practice of applying deductibles to ACV claims is permissible under the terms of its policy. Therefore, all class members' claims will rise or fall collectively based on a determination of this question. As Rule 23(a)(2) requires only one common issue of law or fact among class members, this issue alone is sufficient to meet the commonality requirement. *Wal-Mart*, 131 S.Ct. at 2556 ("We quite agree that for the purposes of Rule 23(a)(2) 'even a single common question' will do."); *see also DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995) ("The Crehans claim that the differing types of mortgage contracts give rise to different claims that call for different treatment through subclasses. The fact that individuals with different mortgage forms will have RESPA or contract claims of differing strengths does not impact on the commonality of the class as structured, however.").[4]

### 3. Typicality

The typicality requirement is met when the claims or defenses of the representative party are typical of those of the class. Fed. R. Civ. P. 23(a)(3). The requirement "is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.,* 64 F.3d 1171, 1174 (8th Cir. 1995). In determining typicality, courts consider whether the named plaintiff's claim "arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.,* 84 F.3d 1525, 1540 (8th Cir. 1996).

The Bonds' claims and the claims of the remainder of the putative class arise from the

---

[4] Liberty does not directly contest that the proposed class meets Rule 23(a)(2)'s commonality requirement.

same course of conduct: Liberty's practice of applying a deductible to ACV property damage claims in Missouri. Like the class members seeking a declaratory judgment, the Bonds had a loss to their dwelling or other structure arising under policy form HO 03 (Edition 04 09). Like the class members seeking injunctive relief, the Bonds are currently insured by Liberty under this policy and are subject to Liberty's practice of applying deductibles to ACV payments. The fact that some class members have never had a property loss under the policy, and some class members received an RCV payment, does not defeat typicality because the class members' claims all arise from the same course of conduct. *See Alpern*, 84 F.3d at 1540 (Factual differences between a plaintiff's individual claims and class claims "will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory") (discussing typicality). In other words, those class members who did not experience a loss or file a claim, as well as those class members who received an RCV claim, are still like the Bonds in that their claims arise from the same common practice. *See also Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 428 (6th Cir. 2012) ("Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.") (certifying (b)(2) declaratory relief class despite defendant insurer's contention that not every class member had made a claim for payment after the policy change at issue).

Although the Bonds' claim was paid pursuant to the Home Protector Plus Endorsement and Wind/Hail Endorsement addendums to the base policy language, the Bonds contend that a class should be certified including individuals with policies which may or may not have had these endorsements and may have been subject to additional endorsements. Although expansive, this class definition does not preclude typicality for a number of reasons. First, all members of

the putative class are subject to the same base policy language.  Second, the proposed class is limited to Missouri policyholders to whom the same legal standards and methods of contract interpretation apply.  Finally, as discussed more fully below in conjunction with the cohesiveness inquiry, the Court can address any endorsement-related conflicts of interest that may develop as the case progresses through the designation of subclasses, if necessary.

The common theory surrounding the declaratory and injunctive relief requested, the identical base policy terms, and the common legal framework surrounding the class members' claims distinguish this case from the cases cited by Liberty to support its contention that the Bonds are not typical of the class.  *Cf. Gustafson v. BAC Home Loans Servicing LP*, 294 F.R.D. 529, 542-43 (C.D. Cal. 2013) (noting that the contracts contained numerous material variations of the provisions serving as the basis of the breach of contract claim and that the plaintiffs sought to certify a nationwide class which compounded the disparities among class members); *Duchardt v. Midland Nat. Life Ins. Co.*, 265 F.R.D. 436, 445-48 (S.D. Iowa 2009) (concluding that though the variance in the terms in the contracts could be cured by narrowing the proposed classes or creating separate subclasses, typicality was lacking because different legal standards would need to be applied to the breach of contract claims).  As already discussed, the challenged conduct at issue—Liberty's consistent practice of applying a deductible to ACV payments under its policy Form HO 03 (Edition 04 09)—is applicable to the entire class, regardless of whether a class member has suffered a loss or not, or has pursued an RCV claim.  Typicality is satisfied.

### 4.    Adequacy

Rule 23(a)(4) requires that the class representative and class counsel will "fairly and adequately protect the interests of the class."  The adequacy requirement is met where:  "1) the representatives and their attorneys are able and willing to prosecute the action competently and

vigorously; and 2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *Carpe v. Aquila, Inc.,* 224 F.R.D. 454, 458 (W.D. Mo. 2004) (internal quotes omitted). The requirement of adequacy "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625 (1997).

The Bonds' interests are aligned with those of the class because as discussed above, their claims arise out of the same common course of conduct and are based upon the same legal theories as the class members' claims. *See Wal-Mart v. Dukes*, 564 U.S. 338, 349, n. 5 (2011) (noting that the two requirements of typicality and adequacy "tend to merge"). Furthermore, the proposed class counsel has extensive experience prosecuting class actions and will vigorously represent the plaintiffs in this action. Liberty has neither suggested that class counsel is incapable of litigating this action nor that the Bonds are inadequate class representatives. The adequacy requirement is satisfied.

### D. Rule 23(b)(2)

To certify the class, the Bonds must further prove they meet the requirements of Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Eighth Circuit stated in *DeBoer v. Mellon Mortgage Co.* that "[i]f the Rule 23(a) prerequisites have been met and injunctive or declaratory relief has been requested, the action usually should be allowed to proceed under subdivision (b)(2)." *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1175 (8th Cir.1995) (quoting 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1775 (1986)).

Although a Rule 23(b)(2) class is not required to satisfy the additional predominance and superiority requirements of Rule 23(b)(3), "the class claims must be cohesive." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998)). For purposes of 23(b)(2), cohesiveness requires that "the relief sought must perforce affect the entire class at once." *Id.* In contrast, cohesiveness is lacking where "each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.* at 480-81.

The Bonds argue that their proposed class satisfies Rule 23(b)(2) because Liberty has undertaken a systematic practice of applying a deductible to ACV payments made to its insureds under policy Form HO 03 (Edition 04 09), a practice that the Bonds contend is contrary to the language of the insurance policy. As to cohesiveness, the Bonds argue that because the litigation involves a form contract, the interpretation will result in one declaratory judgment and/or injunction applicable to all class members, not numerous individual judgments. The Court agrees. All class members are subject to the same base policy. Although there is some variation in the specific endorsements that apply to each class member's policy, this variation does not defeat cohesiveness, as discussed below.

### 1. The Base Policy and Home Protector Plus Endorsement

The Bonds are correct that the underlying base policy Form HO 03 (Edition 04 09) at issue is a form contract. As previously stated, all class members are subject to the same base policy language. However, some class members' policies include any number of several endorsements, each of which modifies the base policy language relevant to this lawsuit. The Home Protector Plus Endorsement is one such endorsement.

The base policy Form HO 03 (Edition 04 09) contains the following Loss Settlement provision which addresses how RCV and ACV claims will be paid under the policy. It states in relevant part:

| SECTION I – CONDITIONS |
|---|

. . .

    3.     Loss Settlement.     Covered property losses are settled as follows:

    . . .

        b.  Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

            (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

            . . .

            (4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

            . . .

            (5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

[Doc. 51-3, p. 13-14 (Bond Policy)]. In policies amended by the Home Protector Plus Endorsement, the above provision may be replaced by the following if prerequisites[5] are met:

**<u>HOMEPROTECTOR PLUS ENDORSEMENT</u>**

. . .

**B.      REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**

---

[5] Policyholders are required to notify Liberty within 90 days of the start of any additions, alterations or improvements to the dwelling which will increase the replacement cost of the dwelling by $5000 or more. [Doc. 51-3, p. 23 (Bond Policy)].

. . .
3. Loss Settlement. Covered property losses are settled as follows:

    a.  The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:

        (1) We will pay the cost of repair or replacement, but not exceeding:

        . . .

        (3) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.

    . . .

    d.  You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

[Doc. 51-3, p. 23].

Though the Loss Settlement language of the Home Protector Plus Endorsement replaces the Loss Settlement language of the base policy in cases in which it applies, this endorsement alone does not preclude cohesiveness because the provisions are functionally identical. Both provisions state that the RCV will be paid "after application of deductible and without deduction for depreciation." They go on to state, "We will pay no more than the actual cash value of the damage until actual repair or replacement is complete." Finally, they state, "You may disregard the [RCV] provision[] and make [a] claim [] for loss [] or damage[s] to [property] on an actual cash value basis [and] then make claim within 180 days after loss for [] additional liability . . . ." There are no substantive differences in the language of the base policy and the Home Protector Plus Endorsement related to how the deductible is to be applied.

## 2. Other Endorsements

Although the Court has established that it is possible to interpret the base policy and Home Protector Plus Endorsement for the entirety of the class, this interpretation and resulting

declaratory and/or injunctive relief will not afford relief to the entirety of the Bonds' proposed class. Liberty argues that because each class member's policy may contain any number of six other potential endorsements, it is impossible to interpret the base policy for the class as a whole. According to Liberty, the Bonds' class is not cohesive because the different endorsements contained within each policy may affect how the ACV deductible is applied under the base policy, preventing the Court from issuing a single declaratory judgment or injunction.

Besides the Home Protector Plus Endorsement, Liberty lists six additional endorsements, each of which Liberty contends may affect how the base policy ACV deductible is applied: (1) the Windstorm or Hail Endorsement; (2) the Functional Replacement Cost Loss Settlement Endorsement; (3) the Earthquake Endorsement; (4) the Waiver of Deductible endorsement; (5) the Back Up of Sewer and Sump Pump Overflow coverage; and (6) the Actual Cash Value Loss Settlement Windstorm or Hail Losses to Roof Surfacing endorsement. In cases in which a class member made a past claim or may make a future claim for coverage afforded by one of these endorsements, the endorsement, rather than the base policy language, controls the scope of the coverage and recovery the class member is entitled to. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 107-08 (Mo. Ct. App. 2009).

Liberty argues that these endorsements defeat cohesiveness because the Court must interpret each of the relevant endorsements separately to determine whether the deductible is to be subtracted from the ACV payment in each type of claim. In addition, Liberty cites its expert for the proposition that there are over 1,700 different possible form combinations among the 8,471 damage claims in the putative class. [Doc. 54, p. 19]. Because insurance policies must be interpreted as a whole, Liberty argues that these differences preclude certification. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015).

Liberty's argument, however, is limited to merely listing these endorsements as "just a few contract variations and forms that can change the interpretation of the policy as a whole" and attaching them to its briefing. [Doc. 54, p. 19]. Liberty has neglected to provide any specific arguments about how these forms defeat the cohesiveness of the Bonds' proposed class, and Liberty has not identified any specific provision in any of the endorsements it lists which bears on the interpretation of the ACV provisions in the base policy. Instead, Liberty contends that it is the Bonds' burden to establish that none of the other endorsements will affect the interpretation of the ACV provisions.

It would be wholly unreasonable, however, to require the Bonds to discuss in the class certification motion every provision in every potential endorsement which could be contained within a class member's policy to demonstrate that it does not affect how deductibles may be applied to ACV claims under the base policy. In its briefing, Liberty had the opportunity to identify examples of provisions in other endorsements which could affect how deductibles may be applied to ACV claims under the base policy. However, Liberty identified no example of any such provision. Although the Bonds have the burden of proof to establish that class certification is appropriate, it is common sense that Liberty may not defeat class certification by making claims unsupported by evidence, particularly given that Liberty wrote the policies at issue and is thus the party with the most familiarity with the policy terms and in the best position to identify provisions which support their argument.

As the endorsements are only relevant to the extent a policyholder's loss is covered by the terms of the endorsements, the Court need not concern itself with distinguishing among all possible combinations of endorsements which together create the full scope of a class member's

policy.[6]  If, as the case progresses, a need develops for subclasses to address conflicts of interest that arise with respect to individual endorsements, the Court retains the flexibility and authority to create them.  *See* Fed. R. Civ. P. 23(c)(5) (providing a mechanism for dividing a class into subclasses where it is necessary to make some distinctions among class members); *see, also, Johnson v. Meriter Health Svcs. Employee Retirement Plan*, 702 F.3d 364 (7th Cir. 2012) (affirming district court's certification of a 23(b)(2) injunctive and declaratory relief class comprised of 10 subclasses to account for the many variations within the Meriter pension plan and the class members' different participant statuses in the pension plan).  This is because an order that grants class certification may be altered or amended at any time before the decision on the merits.  *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").  Moreover, "[t]he Court is not obligated to create subclasses at the class certification stage of the litigation, but retains the 'flexibility to certify subclasses as the case progresses and as the nature of the proof to be developed at trial becomes clear.'"  *Warren v. Xerox Corp.*, 2004 WL 1562884 (E.D.N.Y Jan. 26, 2004) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 379 (2d Cir. 1997)).

### 3.  Hybrid Certification & Rule 23(b)(2)

Liberty makes several additional arguments for why the Bonds' proposed class cannot be certified under Rule 23(b)(2).  First, Liberty argues that monetary damages predominate over the

---

[6] The Court also need not concern itself with variable use of the word "deductible" throughout the Home Protector Plus Endorsement, the base policy, or the declarations.  First, as noted above, all class members have the same underlying base policy which is identical.  As such, there is no risk that the term deductible is being applied differently in the base policy language.  There is also no evidence that the language of the declarations page varies among class members beyond numeric differences in the valuation of the policyholders' property and the amount of the applicable deductibles.  All the evidence presented to date suggests that these policies can be comprehensively analyzed.  Therefore, the Court finds it unlikely that there are a significant number of other relevant provisions in these documents.

injunctive and declaratory relief sought by the Bonds, barring the class from certification under (b)(2). Liberty's argument is based on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), in which the Supreme Court held that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." Liberty contends that because monetary damages are "the primary thrust" of the Bonds' case, certification under Rule 23(b)(2) is inappropriate.

As discussed previously, however, the Court has bifurcated the Bonds' class action into an initial Rule 23(b)(2) phase followed by a Rule 23(b)(3) monetary damages phase. As a result, the Bonds have "insulated the (b)(2) class from the money-damage portion of the case," which the Eighth Circuit has recognized as "an available approach that is gaining ground in class actions." *Ebert v. General Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016) (citing Newberg on Class Actions § 4:38).

Similarly, other courts have sanctioned this bifurcation approach, as well. For example, in *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402 (6th Cir. 2012), a plaintiff-insured brought a class action lawsuit against Life Investors Insurance Company alleging breach of contract. The plaintiff alleged Life Investors had improperly begun interpreting the "actual charges" provision of his cancer-insurance policy to mean the charges that the medical provider accepts as full payment from the primary insurer and the insured. *Id.* at 411-12. Like the Bonds' case, *Gooch* involved a bifurcated approach in which the plaintiff sought certification of a (b)(2) declaratory relief class regarding interpretation of the contract to be followed by certification of a later (b)(3) monetary relief class. The Sixth Circuit determined certification was appropriate for the 23(b)(2) class of policyholders with this cancer-specific insurance policy because it found that the declaratory judgment sought would "apply to a uniform interpretation of a contract that

governs or governed each class member." *Id.* at 428 (emphasis added). After considering Life

Investor's *Wal-Mart* argument, the Sixth Circuit concluded:

> The point is not simply that declaratory relief predominates over monetary relief
> or that monetary relief is incidental to declaratory relief. It is that, in this case,
> declaratory relief is a separable and distinct type of relief that will resolve an issue
> common to all class members.

*Id.* The Sixth Circuit summarized its holding, "[C]ertifying declaratory relief under Rule

23(b)(2) is permissible even when the declaratory relief serves as a predicate for later monetary

relief, which would be certified under Rule 23(b)(3)." *Id.* at 429.

As in *Gooch*, declaratory relief in the Bonds' case is a separable and distinct type of relief

that will resolve an issue common to all class members: whether a deductible must be applied to

an ACV claim paid out under the base policy and any of its six endorsements. Therefore, the

fact that this determination serves as a predicate to a later 23(b)(3) class seeking monetary

damages, which are arguably the thrust of the Bonds' case, does not make the Bonds' class

inappropriate for certification under Rule 23(b)(2). *See also Johnson v. Meriter Health Services

Employee Retirement Plan*, 702 F.3d 364 (7th Cir. 2012) (affirming certification of ten 23(b)(2)

subclasses seeking declarations of the rights of their members under the ERISA plan and

injunctions directing that the plan's records be reformed to reflect those rights, to be followed by

a 23(b)(3) proceeding determining monetary relief).

Liberty's reliance on the Seventh Circuit's decision in *Kartman* does not support a

contrary result. *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011). In

*Kartman*, the plaintiffs were homeowners who held insurance policies issued by the defendant

insurer State Farm. *Id.* at 886. After a severe hail storm, thousands of policyholders filed claims

with State Farm, and several who were dissatisfied with the insurance payment they received

brought a putative class action alleging breach of contract, bad-faith denial of insurance benefits,

and unjust enrichment. *Id.* The plaintiffs sought to certify a damages class under Rule 23(b)(3) and an injunctive relief class under Rule 23(b)(2) to "determine whether State Farm should be required to reinspect policyholders' roofs pursuant to a 'uniform and objective standard.' " *Id.* The district court declined to certify the damages class but certified an injunctive relief class under Rule 23(b)(2). *Id.*

State Farm appealed, and the Seventh Circuit concluded that the injunctive relief class should not have been certified. *Id.* at 887. The Seventh Circuit reasoned that the certification of the injunctive relief class under Rule 23(b)(2) resulted from a "legal misunderstanding about the nature of the plaintiffs' claims." *Id.* at 888. The court explained:

> State Farm had a contractual obligation to pay policyholders for their hail-damage losses and a corresponding duty in tort not to deny claims in bad faith. But there is no contract or tort-based duty requiring the insurer to use a *particular standard* for assessing hail damage. As such, there is no independent cognizable wrong to support a claim for injunctive relief requiring State Farm to conduct a class-wide roof reinspection pursuant to a "uniform and objective standard."

*Id.* at 886 (emphasis added). The court further explained that the injunctive relief sought—requiring a class-wide roof reinspection—also would not result in "final relief" because such a "reinspection would only initiate thousands of individualized proceedings to determine breach and damages." *Id.* at 893.

The Bonds' class action is different. Unlike in *Kartman*, the Bonds' theory is not a "noncognizable" theory that an insurance company must use a particular method to evaluate damage to their property. *See id.* at 889. Rather, the Bonds' bifurcated (b)(2) class has a contract-based theory that Liberty's policy language prohibits the application of a deductible to ACV claims. The Bonds seek an order from this Court interpreting the policy and declaring whether the policy permits Liberty to subtract a deductible from an ACV payment, as well as corresponding injunctive relief requiring Liberty to adjust its claims practices accordingly. Also

distinguishable is that the relief sought by the Bonds will not lead to individualized, fact-specific proceedings unique to each class member as in *Kartman*, but instead, will result in a uniform contract interpretation that will apply finally to all class members and that Liberty will be required to follow as to all insureds.

The remaining two cases cited by Liberty, which were decided by this Court, are also distinguishable. *See Barfield v. Sho-Me Power Elec. Co-op.*, 2013 WL 3872181 (W.D. Mo. July 25, 2013); *Jalili v. American Family Mutual Ins. Co.*, 2016 WL 3566252 (W.D. Mo. June 2, 2016). Unlike in the Bonds' case, the Court in those cases had not previously granted a motion to bifurcate the class action prior to the plaintiffs moving for class certification. Instead, in *Barfield*, for instance, the plaintiffs moved for certification of the same class definition under (b)(3) and/or (b)(2) at the same time. *Barfield v. Sho-Me Power Elec. Co-op.*, 2013 WL 3872181 (W.D. Mo. July 25, 2013). As a result, and in contrast to the Bonds' case, the *Barfield* plaintiffs still sought monetary relief in conjunction with the (b)(2) class. *Id.* at *6. As for *Jalili*, the Court has already distinguished this case previously in Section II.A.2. *Cf. Jalili v. American Family Mutual Ins. Co.*, 2016 WL 3566252 (W.D. Mo. June 2, 2016) (denying motion to amend to add (b)(2) class and denying motion to bifurcate where insurer defendant had changed its policy language so that the plaintiffs' injunctive relief claim was moot).

Finally, the Court rejects Liberty's additional arguments that the Bonds' (b)(2) class would impermissibly lead to "individualized" damages amounts, resulting in due process or claim preclusion problems. Again, these arguments are premised on the *Wal-Mart* Court's holding that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." 564 U.S. at 361. Liberty's arguments fail, however, because unlike the putative (b)(2) class in *Wal-Mart*, the Bonds'

putative (b)(2) class does *not* seek any monetary relief. *Wal-Mart* does not stand for the proposition that (b)(2) classes violate due process, nor that bifurcated proceedings are not permitted; instead, *Wal-Mart* holds that a (b)(2) class cannot seek individualized monetary damages. As already discussed, the Court bifurcated the Bonds' case into a (b)(2) liability phase and (b)(3) damages phase, permissibly "insulating" the monetary damages from the (b)(2) class. *See Ebert v. General Mills, Inc.*, 823 F.3d 472, 480 (8th Cir. 2016); Newberg on Class Actions § 4:38 ("Certification of a hybrid action . . . insulates the (b)(2) class piece from the money damage portion of the case, hence complying with *Wal-Mart*'s admonition against adjudicating individual damage claims in a (b)(2) class action"). As a result, this hybrid certification approach complies with *Wal-Mart*'s prohibition of (b)(2) classes in which individualized monetary damages will be awarded.


IV.     **Conclusion**

Plaintiffs' motion for class certification, Doc. 50, is granted, and the class is defined as discussed above.


/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge


Dated: May 1, 2017
Jefferson City, Missouri