**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| DAVID BOND and REBECCA BOND, | ) | |
| individually and on behalf of others | ) | |
| similarly situated, | ) | |
| | ) | No. 2:15-cv-04236-NKL |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LIBERTY INSURANCE CORPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Pending before the Court are the cross motions for summary judgment of Plaintiffs David and Rebecca Bond and Defendant Liberty Insurance Corporation. [Docs. 72 and 74]. The motions are granted in part and denied in part.

**I.    Undisputed Facts[1]**

Plaintiffs David and Rebecca Bond purchased a LibertyGuard Deluxe Homeowners Insurance Policy, Form HO 00 03 (Edition 04 09), from Defendant Liberty Insurance Corporation ("Liberty"). The Bonds' policy includes an endorsement for wind and hail damage. In April 2014, the Bonds' home was damaged by hail, and they submitted a claim to Liberty for coverage of that hail damage.

**A.  Liberty's General Claims Handling Procedure**

When a homeowner sustains damage to a dwelling or other structure covered by a LibertyGuard Deluxe Homeowners Policy, the claim is handled and paid in two phases: (1) the actual cash value ("ACV") phase and (2) the replacement cost value ("RCV") phase. After the

---

[1] Although the parties have denied their opponents' facts by trying to limit them to the inference or interpretation each prefers, some facts are clearly undisputed.

policyowner makes his or her claim, an adjustor goes to the location of the insured property to ascertain the damage. [Doc. 75-3, p. 141-45 (Depo. of Ricky Summerlin)]. The adjustor then uses a program called "Xactimate" to put a dollar figure on the amount of the damage. *Id.* The amount that Xactimate totals is the estimated amount to repair or replace the damage for a dwelling or other structure loss. [Doc. 79, p. 13 of 29]. After this amount is calculated, the adjustor inputs factors for depreciation, and the amount of depreciation is subtracted from the replacement cost to arrive at the ACV. [Doc. 75-3, p. 145-46].

Following this calculation, the policyowner is paid the ACV of the loss, minus the deductible. No further payment on the claim is made unless the insured decides to repair or replace the damage to the property. *Id.* at p. 155-56. The insured is not required to undertake this repair. *Id.* at p. 148-50. Nor is the insured required to come back and submit a replacement cost claim for payment of the withheld depreciation. *Id.* at p. 150-51. Instead, the insured may take the ACV payment in satisfaction of their claim to do with whatever he or she chooses. *Id.* at p. 148-50. To recover the RCV, the insured must repair or replace the damage and submit proof of the repairs to Liberty. *Id.* at p. 155-56.

**B.   The Bonds' Claim**

In April 2014, the Bonds' home suffered hail damage, and they submitted a claim for coverage. This claim constituted a loss that was covered under the terms of the policy. Liberty inspected the Bonds' home and paid the Bonds the ACV minus a $1,522 deductible. On April 29, 2016, the Bonds filed a putative class action against Liberty alleging that Liberty unlawfully applied a deductible to the ACV payment for their hail damage claim.

On May 26, 2016, the Court granted the Bonds' unopposed motion to bifurcate the class certification proceedings into separate Rule 23(b)(2) and (b)(3) phases. *See* [Doc. 36].

- 2 -

On May 1, 2017, the Court certified a Rule 23(b)(2) class divided into injunctive and declaratory relief subclasses and appointed the Bonds as class representatives:

(1) **Injunctive Relief Subclass:** all persons with a dwelling or other structure located in the state of Missouri insured by Liberty Insurance Corporation under policy Form HO 03 (Edition 04 09) and endorsements at the time of class certification.

(2) **Declaratory Relief Subclass:** all persons insured by Liberty Insurance Corporation who incurred physical loss or damage to their dwelling or other structures located in the state of Missouri from April 20, 2009 to the date of class certification arising under policy Form HO 03 (Edition 04 09) and endorsements.[2]

[Doc. 66].

### C. Class Members' Policies

The class members' policies contain three relevant sections: the Declarations, the base policy language, and the endorsements. These sections work together to define the parameters of their coverage. The Declarations set out the limits on recovery under the policy, list the endorsements included in the policy, and note the deductibles that may be assessed under the policy. The base policy language contains the standard terms of the policy. The endorsements are additions to the policy which customize the coverage and terms of the base policy language to create the specific coverage purchased by the policyowner. The terms of the endorsements control over conflicting provisions in the base policy language or Declarations. *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 108 (Mo. Ct. App. 2009).

### 1. The Base Policy

The Bonds' and class members' base policy form HO 00 03 (Edition 04 09) includes, among others, the following: Section I – Property Coverages; Section I – Perils Insured Against; Section I – Exclusions; and Section I – Conditions. The base policy's coverage provision states:

---

[2] Excluded from the Class are: (1) Liberty Insurance Corporation and its affiliates, officers, and directors; (2) Members of the judiciary and their staff to whom this action is assigned; and (3) Plaintiffs' Counsel.

| SECTION I – PROPERTY COVERAGES |
|---|

**COVERAGE A – Dwelling**
We cover:
1.  The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

. . .

**COVERAGE B – Other Structures**
We cover other structures on the "residence premises" set apart from the dwelling by clear space.

. . .

**COVERAGE C – Personal Property**
We cover personal property owned or used by an "insured" while it is anywhere in the world.

. . .

**COVERAGE D – Loss of Use**
The limit of liability for Coverage D is the total limit for all the coverages that follow.
1.  If a loss covered under this Section makes that part of the "residence premises" where you reside not fit to live in, we cover, at your choice, either of the following. . .

. . .

**ADDITIONAL COVERAGES**

. . .

**4.  Fire Department Service Charge**.  We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. . . .
This coverage is additional insurance.  No deductible applies to this coverage.

. . .

The base policy's loss settlement provisions for Coverages A, B, and C are included

within Section I – Conditions, as follows:

| SECTION I – CONDITIONS |
|---|

. . .

   **3.**     **Loss Settlement.**     Covered property losses are settled as follows:
          a.  Property of the following types:
              (1)  Personal property;
              (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings; and
              (3)  Structures that are not buildings;
              at actual cash value at the time of loss but not more than the amount required to repair or replace.
          b.  Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

- 4 -

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

>   (a) The limit of liability under this policy that applies to the building;
>   (b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or
>   (c) The necessary amount actually spent to repair or replace the damaged building.

(2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

>   (a) The actual cash value of that part of the building damaged; or
>   (b) That proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

. . .

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

. . .

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

[Doc. 73-1, p. 14-16 of 44 (Bond Policy)].

## 2. The Endorsements

The Bonds' and some class members' insurance policies include a Home Protector Plus Endorsement. If certain conditions are met,[3] the Home Protector Plus Endorsement has a slightly different loss settlement provision, as follows:

### HOMEPROTECTOR PLUS ENDORSEMENT

. . .

**B. REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**

. . .

3. Loss Settlement. Covered property losses are settled as follows:

a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:

(1) We will pay the cost of repair or replacement, but not exceeding:

. . .

(3) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.

. . .

c. Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:

. . .

(3) We will not pay for any loss to personal property under this endorsement until actual repair or replacement is complete.

d. You may disregard the replacement cost provision and make a claim for loss of or damage to property on an actual cash value basis and then make claim within 180 days after loss for additional liability under this endorsement.

. . .

**D. ADDITIONAL COVERAGES**

Lock Replacement Coverage

We will pay up to $250 for replacing the locks or cylinders on the exterior doors of the residence premises when your keys have been stolen. The theft of the keys must be reported to the police for this coverage to apply. This coverage is additional insurance. No deductible applies to this coverage.

---

[3] Both parties agree that these conditions have been met, and therefore, they are not relevant to the analysis.

- 6 -

[Doc. 73-1, p. 23-24 (Bond Policy)].

The Bonds' and some class members' insurance policies also contain a Windstorm or

Hail Deductible Endorsement ("Wind/Hail Endorsement"), which states:

> **WINDSTORM OR HAIL DEDUCTIBLE – DWELLING**
> **The following special Deductible is added to the policy:**
> For the premium charged, we will pay only that part of the total of covered
> direct physical loss to property covered under Section I of this policy
> caused by Windstorm or Hail that exceeds the Windstorm or Hail
> Deductible as shown on the Declarations as follows:
>
> **A.   When this Windstorm or Hail Deductible Applies**
> This Deductible applies in the event of direct physical loss to property
> covered under this policy caused directly or indirectly by the perils of
> Windstorm or Hail.
> . . .
> **B.  How the Windstorm or Hail Deductible Amount is Determined**
> The Windstorm Deductible may be either a fixed dollar amount or
> percentage based, but not both. . . .

[Doc. 73-1, p. 42 (Bond Policy)].

Some class members' policies contain a Functional Replacement Cost Loss Settlement

Endorsement ("FRCE").  This endorsement also contains its own loss settlement provision,

which provides:

> **FUNCTIONAL REPLACEMENT COST LOSS SETTLEMENT**
> . . .
> **SECTION I – CONDITIONS**
> The following definition is added when this endorsement is attached to the policy:
> **Functional Replacement Cost** means the amount which it would cost to repair or
> replace the damaged building with less costly common construction materials and
> methods to obsolete, antique or custom construction materials used in the original
> construction of the building.
> . . .
> For the premium charges, item **3.b. Loss Settlement** is deleted and replaced by the
> following:
>  b. Buildings under Coverage A or B:
>         (1) If, at the time of loss,
>                 (a)  The amount of insurance in this policy on the damaged
>                        building is 80% or more of the functional replacement cost of

- 7 -

the building immediately before the loss; and

    (b)  You contract for repair or replacement of the damaged building for the same use, within 180 days of the damage unless we and you otherwise agree;

we will pay, after application of deductible, the lesser of the following amounts:

    (a)  The limit of liability under this policy that applies to the building; or

    (b)  The necessary amount actually spent to repair or replace the damaged building on a functional replacement cost basis. However, if this amount is less than the actual cash value of that part of the damaged building, we will settle the loss on an actual cash value basis.

(2) If you do not make claim under Paragraph (1) above, we will pay, after application of deductible, the least of the following amounts:

    (a)  The limit of liability under this policy that applies to the building; or

    (b)  The actual cash value of the damaged part of the building.

(3) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the functional replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

    (a) The actual cash value of that part of the building damaged; or

    (b) That proportion of the cost to repair or replace:

        (i)  after application of deductible; and

        (ii) without deduction for depreciation;

that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the functional replacement cost of the building.

. . .

[Doc. 73-5, p. 9-10 of 14 (FRCE Endorsement)].

The Bonds' and some class members' policies contain a Back-Up of Sewer and Sump

Pump Overflow Coverage Endorsement. This endorsement provides:

<u>**BACK-UP OF SEWER AND SUMP PUMP OVERFLOW COVERAGE ENDORSEMENT**</u>

. . .

<u>**PERILS INSURED AGAINST – SECTION I**</u>

For an additional premium, we cover risks of direct physical loss when caused by a peril listed below, unless the loss is excluded in this policy.

. . .

<u>**DEDUCTIBLE**</u>

- 8 -

Each claim for loss to covered property will be adjusted separately. A deductible of $500 will be deducted from each covered loss.

. . .

[Doc. 73-1, p. 25 of 44 (Bond Policy)].

Some class members' policies contain an Earthquake Endorsement. This endorsement also contains its own loss settlement provision, which provides:

**EARTHQUAKE**
1. For an additional premium, we insure for direct physical loss to property covered under Section **I** caused by earthquake . . .
2. **Special Deductible**
   The following deductible provision replaces any other deductible provision in this policy with respect to loss covered under this endorsement:
   We will pay only that part of the loss over __ percent* of the total amount of insurance that applies to the destroyed or damaged property. This deductible will apply separately to each loss under each of Coverage's A (Dwelling), B (Appurtenant Structures), and C (Personal Property). . . .
   The total deductible amount will not be less than $250.
   *Entries may be left blank if shown elsewhere in this policy for this coverage.

[Doc. 79-2, p. 11 of 14 (Earthquake Endorsement)].

### 3. The Declarations

The first two pages of the Bonds' policy contain the "Declarations." In relevant part, the Declarations provide:

| Section I Coverages | LIMITS | PREMIUM |
|---|---|---|
| A. Dwelling with Expanded Replacement Cost | $ 304,500 | |
| B. Other Structures on Insured Location | $ 30,450 | |
| C. Personal Property with Replacement Cost | $ 228,380 | |
| D. Loss of Use of Insured Location | Actual Loss Sustained | |

. . .
Policy Deductibles
Losses covered under Section I are subject to a deductible of $1,000
If losses are a result of Wind/Hail they are subject to a deductible of .5%: $1,522
. . .
Important Messages
. . .
Hail/Windstorm Deductible: This policy contains a separate deductible, different than your Section I deductible, for windstorm or hail losses. This may result in a higher out of pocket expense if a loss occurs due to windstorm or hail. Your

- 9 -

deductible will be listed with your Standard Policy in the Policy Deductibles section.

[Doc. 73-1, p. 2-3 of 44 (Bond Policy)].

### D. Subsequent Revisions to the Liberty's Policy Language

Liberty amended the language in its Missouri insurance policies, including the loss settlement language at issue in this lawsuit within the Earthquake Endorsement, the Home Protector Plus Endorsement, and the Wind/Hail Endorsement. [Doc. 79-1, p. 2]. Liberty has used these revisions for all new insurance policies issued since April 17, 2017. In addition, Liberty has used the revised language in all renewal policies in Missouri effective June 15, 2017.

## II.    Discussion

The primary issue in this lawsuit is whether Liberty's policy permits it to subtract a deductible from an Actual Cash Value payment made for an insured's property damage covered under the base policy, Home Protector Plus Endorsement, or Wind/Hail Endorsement. Plaintiffs' Liberty policy provides several different types of property "coverages," including Coverage A – Dwelling; Coverage B – Other Structures; Coverage C – Personal Property; Coverage D – Loss of Use; and Additional Coverage. The dispute in this lawsuit is whether a deductible should be applied to a claim for Coverage A and/or B damage, regardless of whether the insured opts for an actual cash value ("ACV") payment or a replacement cost value ("RCV") payment. As already discussed, Coverage A and B claims are paid out in two phases: (1) the ACV phase and (2) the RCV phase. After the ACV payment is made to the insured, the claim is complete, and Liberty does not provide any additional payment unless the insured decides to repair or replace the damage to the property and submits proof to Liberty.

- 10 -

Plaintiffs move for summary judgment because they interpret Liberty's base policy and relevant endorsements as allowing a deductible to be taken only when an RCV payment is made to the insured. Plaintiffs move the Court for a declaratory judgment as to Liberty's ability to apply a deductible to ACV payments for Coverage A and B claims, as well as for an injunction precluding Liberty from continuing this practice with future insureds' claims.

Liberty moves for summary judgment arguing that its policy requires the payment of a deductible, regardless of whether the insured opts for an ACV or RCV payment for Coverage A and/or B losses covered by the policy. In doing so, Liberty includes new arguments, as well as arguments it already briefed in opposition to Plaintiffs' motion for class certification, "request[ing] the Court to reconsider its rejection" of those arguments. *See, e.g.,* [Doc. 79, p. 17 of 29, n. 1.].

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). In this case, there is no dispute of material fact. Therefore, the only question is whether Liberty's policy requires a deductible to be paid when an ACV payment is made for Coverage A and B claims, and if so, whether Plaintiffs are entitled to an injunction. According to Plaintiffs' briefing, the declaratory judgment Plaintiffs seek asks the Court to determine whether a deductible must be applied to an ACV payment for Coverage A and B claims made under the base policy, Home Protector Plus Endorsement, and Wind/Hail Endorsement.[4]

---

[4] Plaintiffs' First Amended Complaint seeks a broad declaratory judgment "declar[ing] the true method for the adjustment and payment of claims within the State of Missouri pursuant to the policy language contained in Defendant's subject insurance Policies." [Doc. 27, p. 10]. However, based on Plaintiffs' briefing, which is limited to asking for declarations of the proper claims adjustment methods under the base policy, Home Protector Plus Endorsement, and

### A. Class Certification & Bifurcation

Liberty makes several arguments that must be addressed at the outset. As a threshold matter, the Court rejects Liberty's numerous attempts to relitigate both the appropriateness of bifurcating this action and class certification, issues that this Court has already resolved in prior orders. *See* [Doc. 36 (Order granting Plaintiffs' unopposed motion to bifurcate) and Doc. 66 (Order granting class certification)]. First, Liberty did not oppose Plaintiffs' motion to bifurcate, which was filed at an early stage in this litigation. *See* [Doc. 34 ("Defendant . . . does not have a position on whether the Court should grant or deny Plaintiffs' Motion to Bifurcate" and only providing argument about individual scheduling order deadlines)]. Only now, more than one year later, does Liberty seemingly wish to challenge whether this action should have been bifurcated in the first place by arguing the lack of usefulness and efficiency of bifurcation. The Court rejects such arguments as untimely at this late stage of the litigation.

Second, as to Liberty's arguments going to the appropriateness of class certification, this Court has already spent extensive time analyzing this issue and has addressed Liberty's arguments at length once before.[5] As with its opposition to class certification, many of Liberty's preliminary arguments ignore that this litigation was bifurcated and that Plaintiffs lack the ability

---

Wind/Hail Endorsement, as well as Plaintiffs' having limited their class to insureds with Coverage A and/or B claims, the Court understands Plaintiffs' requested declaratory relief to be narrowed to the claims adjustment method for Coverage A and/or B claims under the previously discussed provisions.

[5] In its Order granting class certification, this Court already addressed Liberty's arguments repeated in this briefing about the purported lack of "corresponding injunctive relief," *see* [Doc. 66, p. 13-15]; the availability of monetary relief as foreclosing the class's ability to seek declaratory relief, *see* [Doc. 66, p. 28-32]; and the cohesiveness of the class with the policy contract, *see* [Doc. 66, p. 22]. Liberty has not provided any new argument that would justify the Court's reconsideration of its prior rulings on these issues.

to recover any monetary damages for the certified Rule 23(b)(2) class. Therefore, the Court declines to reconsider such arguments again at the present summary judgment stage.

In a somewhat related but new argument, Liberty contends that because "Plaintiffs' alleged injury will be fully compensated through their claims for damages," they cannot seek declaratory relief because another adequate remedy exists. [Doc. 73, p. 23 of 34]. However, Liberty's argument contradicts the clear language of the Declaratory Judgment Act, which provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, *whether or not further relief is or could be sought*." 28 U.S.C. § 2201(a) (emphasis added); *see also*, Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."). Furthermore, as this Court has addressed at length in its Order on class certification, the (b)(2) class proceedings in this case are bifurcated from any potential (b)(3) class, which is an approach acknowledged by many circuit courts, including the Eighth Circuit. *See, e.g., Ebert v. General Mills, Inc.*, 823 F.3d 472, 380 (8th Cir. 2016) (identifying class bifurcation as "an available approach that is gaining ground in class actions"); *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 428 (approving this procedure for interpretation of an insurance policy); *Johnson v. Meriter Health Services Employee Retirement Plan*, 702 F.3d 364 (7th Cir. 2012) (certifying ten separate 23(b)(2) subclasses seeking declarations of rights under ERISA plan and injunctive relief and indicating that a 23(b)(3) class could be certified later for monetary relief). If Liberty's contention were true, there could be no bifurcation of class proceedings, which flies in the face of the numerous cases in which this very approach has been employed. For this reason, too, Liberty's cited authority is not persuasive as none of Liberty's cases involve such bifurcated class proceedings.

- 13 -

As a separate argument, which again goes to the appropriateness of class certification, Liberty contends that Plaintiffs' are not entitled to declaratory relief because the relief sought will purportedly not apply to all class members. [Doc. 73, p. 23 of 34]. Specifically, Liberty argues that there cannot be a single declaratory judgment because the declaratory subclass includes former policyholders and individuals who were not injured, as well as numerous endorsements. The Court already rejected several aspects of this argument once before, *see* Doc. 66, p. 22, but also, none of these concerns undermine the Court's ability to enter a single declaratory judgment that "will apply to a uniform interpretation of the contract that governed or governs each class member." *Gooch v. Life Investors Ins. Co. of America*, 672 F.3d 402, 428 (6th Cir. 2012) (certifying (b)(2) declaratory relief class despite defendant insurer's contention that not every class member had been injured by making a claim for payment after the policy change at issue).

For the previous reasons, the Court rejects these preliminary arguments.

**B. Interpretation of Insurance Contracts in Missouri**

The interpretation of an insurance policy is a question of law to be determined by the Court. *Mendota Ins. Co. v. Lawson*, 456 S.W.3d 898, 903 (Mo. Ct. App. 2015). Missouri courts read insurance contracts "as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written." *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. Ct. App. 2011). To determine the intent of the parties, the language in the contract is to be read according to its plain and ordinary meaning. *Mendota*, 456 S.W.3d at 903. If an ambiguity exists the policy language will be construed against the insurer. *Id.* at 904. "'An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language of the policy.'" *Fanning v. Progressive Northwestern Ins. Co.*, 412 S.W.3d 360, 364

- 14 -

(Mo. Ct. App. 2013) (quoting *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007)).  "'To test whether the language used in the policy is ambiguous, the language is considered in the light in which it would normally be understood by the lay person who bought and paid for the policy.'"  *Blumer*, 340 S.W.3d at 219 (quoting *Heringer v. Am. Family Mut. Ins. Co.*, 140 S.W.3d 100, 102 (Mo. Ct. App. 2004)).

As previously explained, an insurance policy consists of the policy, the declarations, and any endorsements and definitions.  *Grable v. Atlantic Cas. Ins. Co.*, 280 S.W.3d 104, 107-08 (Mo. Ct. App. 2009).  "The terms and conditions of the policy are modified and altered to the extent called for by the endorsement.  . . . If the language of the endorsement and the general provisions of the policy conflict, the endorsement will prevail, and the policy remains in effect as altered by the endorsement."  *Id.* at 108 (quotation omitted).

### C.  The Base Policy & Home Protector Plus Endorsement

Liberty's Policy Form HO 03 (Edition 04 09) contains various loss settlement provisions dictating the process by which claims are paid.  The base policy contains a loss settlement provision, which can be modified by five relevant endorsements that offer their own loss settlement provisions: the Home Protector Plus Endorsement, the Wind/Hail Endorsement, the Functional Replacement Cost Loss Settlement Endorsement, the Earthquake Endorsement, and the Back-Up Sewer Endorsement.

As previously described, the base policy contains the following loss settlement provision, which dictates how RCV and ACV claims will be paid under the policy:

| SECTION I – CONDITIONS |
| --- |

. . .
**3.**     **Loss Settlement.**        Covered property losses are settled as follows:
             a.   Property of the following types:

- 15 -

. . .

b.   Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c)  The necessary amount actually spent to repair or replace the damaged building.

(2)  If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a)  The actual cash value of that part of the building damaged; or

(b) That proportion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

. . .

(4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

. . .

(5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis.  You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

[Doc. 73-1, p. 14-16 of 44 (Bond Policy)].

- 16 -

The Home Protector Plus Endorsement contains its own loss settlement provision, which the parties agree is the controlling loss settlement provision when it is added to the base policy and certain conditions are met.[6]  The loss settlement provision in the base policy is substantially the same as that in the Home Protector Plus Endorsement, and as discussed below, it results in the same interpretation.   The Home Protector Plus Endorsement loss settlement provision provides:

**HOMEPROTECTOR PLUS ENDORSEMENT**
. . .
**B.     REPLACEMENT COST PROVISION – DWELLING AND PERSONAL PROPERTY**
. . .
3.  Loss Settlement.  Covered property losses are settled as follows:
a. The applicable limit of liability for Buildings under Coverage A or B is the replacement cost, after application of deductible and without deduction for depreciation, subject to the following:

  (1)  We will pay the cost of repair or replacement, but not exceeding:
    . . .
  (2) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.  Once actual repair or replacement is complete, we will settle the loss according to the provisions of a.(1) above.
. . .
c. Personal property, carpeting and domestic appliances: at replacement cost but not exceeding the amount needed to repair or replace subject to the following:
  (1)  Our limit of liability for loss to Personal Property shall not exceed the smallest of the following:
    (a)  Replacement cost with a similar item of like kind and quality at the time of loss;
    (b)  The full cost of repair;
    (c)  Any special limit of liability described in the policy or

---

[6]For the Home Protector Plus Endorsement loss settlement provision to replace the base policy provision, the insured must meet the following Section 1 Condition:
    17.  Additions or Changes to Dwelling – Notice to Company.  You must inform us within 90 days of the start of any additions, alterations or improvements to the dwelling that will increase the replacement cost of the dwelling by $5000 or more.
[Doc. 73-1, p. 23 of 44 (Bond Policy)].

                              stated in this endorsement; or

       (d)  The Coverage C limit of liability stated in the
               declarations, as modified by the Inflation Protection
               Provision of the policy.

. . .

    (3)  We will not pay for any loss to personal property under this
          endorsement until actual repair or replacement is complete.

 d.  You may disregard the replacement cost provision and make a
     claim for loss of or damage to property on an actual cash value
     basis and then make claim within 180 days after loss for additional
     liability under this endorsement.

[Doc. 73-1, p. 23-24 (Bond Policy)].

Plaintiffs contend that the base policy and the Home Protector Plus Endorsement both preclude application of a deductible to ACV payments for Coverage A and B claims. The Court agrees. First, the endorsement's loss settlement provision contains separate provisions for RCV and ACV losses. For RCV payments, the endorsement provides that "[t]he applicable limit of liability . . . is the replacement cost, *after application of deductible and without deduction for depreciation* . . . ." Section B.3.a. (emphasis added). Section B.3.d. of the endorsement's loss settlement provision provides:

   d.  You may disregard the replacement cost provision and make a claim for loss
      of or damage to property on an actual cash value basis and then make claim
      within 180 days after loss for additional liability under this endorsement.

Thus, the insured who is willing to accept the ACV can disregard the "replacement cost provision," which is the only section in the loss settlement provision that mentions a deductible.

Although the loss settlement language of the Home Protector Plus Endorsement replaces the loss settlement language of the base policy in cases in which it applies, these provisions are functionally identical. Both provisions state that the RCV will be paid "after application of deductible and without deduction for depreciation." They go on to state, "We will pay no more than the actual cash value of the damage until actual repair or replacement is complete." Finally,

- 18 -

they state, "You may disregard the [RCV] provision[] and make [a] claim [] for loss [] or damage[s] to [property] on an actual cash value basis [and] then make claim within 180 days after loss for [] additional liability . . . ."

Just as in the Home Protector Plus Endorsement, the base policy's loss settlement provision contains separate provisions for RCV and ACV losses. For RCV payments, the base policy provides, "If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, *after application of deductible and without deduction for depreciation . . .*" Section I – Conditions, 3.b.(1). Section I – Conditions, 3.b.(5) states:

> (5) You may disregard the replacement cost loss settlement provisions [i.e. Section I – Conditions, 3.b.(1)] and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim within 180 days after loss for any additional liability according to the provisions of this Condition 3. Loss Settlement.

Thus, just as under the Home Protector Plus Endorsement, the insured who is willing to accept the ACV payment under the base policy can disregard the "replacement cost loss settlement provisions," which are the only sections in the loss settlement provision that mention a deductible.

The general rule of contract interpretation, *expressio unius est exclusio alterius,* is instructive here. Both the Home Protector Plus Endorsement and base policy's respective loss settlement provisions are silent regarding an ACV deductible in the face of their explicit references to an RCV deductible. This silence suggests the parties did not intend to make the deductible applicable to ACV payments. *See Smith v. Missouri Local Gov. Employees Retirement System*, 235 S.W.3d 578, 582 (Mo. Ct. App. 2007). Therefore, if, like Plaintiffs, an insured accepts an ACV payment under Section B.3.d of the Home Protector Plus Endorsement

- 19 -

or Section I – Conditions, 3.b.(5) of the base policy, and the insured does not submit a replacement cost claim, Section B.3.a. of the endorsement (or Section I – Conditions, 3.b.(1). of the base policy) is not implicated.  As discussed above, this language establishes that Liberty will not apply a deductible when making ACV payments under the endorsement's Section B.3.d. or the base policy's Section I – Conditions, 3.b.(5).

Liberty, however, contends that the Declarations page, which includes reference to the general Section I deductible, is enough to require Plaintiffs to pay a deductible on all claims. According to Liberty, the Declarations show that the "default" rule is that a deductible always applies to a loss unless expressly excluded.  "When the declarations page clearly communicates the coverage provided by the insurance contract, and the other policy provisions neither expressly change coverage nor reflect a different intention than that clearly expressed on the declarations page, the declarations page controls."  *Christensen v. Farmers Ins. Co., Inc.*, 307 S.W.3d 654, 658 (Mo. Ct. App. 2010) (quotation omitted).  In relevant part, the Declarations provide: "Losses covered under Section I are subject to a deductible."  Contrary to Liberty's argument, this provision does not state that the class members' claims are subject to a deductible regardless of the compensation style selected.  First, the Declarations' reference to a deductible does not "clearly communicate[] the coverage" of the deductible to a policy holder's claim because on its face, nothing in the Declarations references under what circumstances the Section I deductible will be applied.  Instead, the conditions governing when this deductible is applied are set out in the remainder of the policy.  Therefore, because the Declarations are not clear standing alone as to when a deductible applies, the Court must turn to the terms laid out in the remainder of the policy.  And, as described above, the terms of the base policy and Home Protector Plus Endorsement do not require the payment of a deductible on ACV claims.

Liberty also points to its Online Glossary of Insurance Terms, arguing that the glossary's definition of "deductible" shows that a deductible must be applied to ACV claims. The Declarations reference the Glossary by stating, "Insurance Glossary. For definitions of insurance terms, please visit LibertyMutual.com/insurance-glossary." The Glossary defines "deductible" as "The amount of a claim that you agreed to pay at the time you purchased insurance. This amount is deducted from a claims payment." [Doc. 79-1, p. 4 of 21]. Liberty's argument fails, however, because the Glossary's definition does not change the analysis. There is no dispute surrounding what is meant by the term, "deductible," and the Glossary's definition, like the Declarations page, does nothing to outline the circumstances under which a policyholder must pay the deductible. The circumstances under which a deductible must be paid are contained in the applicable insurance contract. Therefore, neither the Glossary nor the Declarations result in a different interpretation of the Base Policy or Home Protector Plus Endorsement.

Liberty further contends that, in contrast to Plaintiffs' interpretation of the Base Policy and Home Protector Plus Endorsement as only permitting the application of a deductible to RCV claims, in fact, various endorsements evince the opposite: that the "default" rule is that a deductible applies to each and every claim, unless expressly excluded. As support for this argument, Liberty points to three separate endorsements as "examples,"[7] including (1) the Back-Up of Sewer and Sump Pump Overflow Coverage Endorsement; (2) the Earthquake Endorsement; and (3) the Functional Replacement Cost Loss Settlement Endorsement.

---

[7] Because Liberty refers to these endorsements as "examples," it is unclear if Liberty believes there are other endorsements that purportedly undermine Plaintiffs' interpretation of the Base Policy and Home Protector Plus Endorsement. However, to the extent that Liberty contends other "conflicting" endorsements exist, it is up to Liberty, not the Court or Plaintiffs, to raise those endorsements and accompanying argument in its briefing.

### a. Back-Up Sewer Endorsement

The Back-Up Sewer and Sump Pump Overflow Coverage Endorsement applies to Section I and expands coverage to a peril that is otherwise excluded. In relevant part, it provides:

> **DEDUCTIBLE**
> Each claim for loss to covered property will be adjusted separately. A deductible of $500 will be deducted from each covered loss.

[Doc. 73-1, p. 25 of 44 (Bond Policy)]. Liberty argues that this clear language shows that a deductible must always apply to Back-Up Sewer claims because the endorsement lacks any language reflecting otherwise. The Court agrees with this conclusion, which Plaintiffs do not contest. This endorsement is clear that claims for damage due to sewer back-up or sump pump overflow brought under this endorsement "will be adjusted separately" and will have a $500 deductible applied to each covered loss, regardless of the method by which those losses are calculated. Therefore, the Court amends the class definition to exclude individuals with claims under the Back-Up Sewer Endorsement, an available solution that Plaintiffs also acknowledge in their briefing. [Doc. 78, p. 16 of 21]; *see also* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").

Although Liberty further argues that this endorsement undermines Plaintiffs' interpretation of the Base Policy and Home Protector Plus Endorsement, it does not. Nothing about this endorsement clarifies how claims are to be settled under those loss settlement provisions, and Liberty fails to analyze the operative language related to Coverage A and B in those provisions. The fact that a separate deductible of $500 applies to claims brought under this Endorsement does not somehow lead to the conclusion that claims brought under the Base Policy and Home Protector Plus Endorsement must always have a deductible applied.

**b. Earthquake Endorsement**

Next, Liberty points to the Earthquake Endorsement, which in relevant part provides:

**3. Special Deductible**
The following deductible provision replaces any other deductible provision in this policy with respect to loss covered under this endorsement:
We will pay only that part of the loss over __ percent* of the total amount of insurance that applies to the destroyed or damaged property. This deductible will apply separately to each loss under each of Coverage's A (Dwelling), B (Appurtenant Structures), and C (Personal Property).
. . .
The total deductible amount will not be less than $250.
*Entries may be left blank if shown elsewhere in this policy for this coverage.

[Doc. 79-2, p. 11 of 14 (Earthquake Endorsement)]. Liberty argues this language is clear that a deductible applies for an insured's ACV claim related to an earthquake loss. The Court agrees, and Plaintiffs offer no argument to the contrary. Therefore, again, the class definition is amended to exclude individuals with claims brought under the Earthquake Endorsement. As with the Back-Up Sewer Endorsement, however, nothing about the Earthquake Endorsement undermines Plaintiffs' interpretation of the loss settlement provisions in the Base Policy and Home Protector Plus Endorsement.

**c. Functional Replacement Cost Loss Settlement Endorsement**

Like the previous two endorsements, Liberty identifies the FRCE as permitting a deductible to be applied to ACV claims brought under it. When attached to the base policy and when applicable, the FRCE replaces the base policy's loss settlement provision with the following:

b. Buildings under Coverage A or B:
(1) If, at the time of loss,
. . .
we will pay, after application of deductible, the lesser of the following amounts:
(a) The limit of liability under this policy that applies to the building; or

(b) The necessary amount actually spent to repair or replace the damaged building on a functional replacement cost basis. However, if this amount is less than the actual cash value of that part of the damaged building, we will settle the loss on an actual cash value basis.

(2) If you do not make claim under Paragraph (1) above, we will pay, after application of deductible, the least of the following amounts:

(a) The limit of liability under this policy that applies to the building; or

(b) The actual cash value of the damaged part of the building.

(3) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the functional replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

(a) The actual cash value of that part of the building damaged; or

(b) That proportion of the cost to repair or replace:

(i) after application of deductible; and

(ii) without deduction for depreciation;

that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the functional replacement cost of the building.

. . .

[Doc. 73-5, p. 9-10 of 14 (FRCE Endorsement)].  Section b.(1) specifically states that Liberty will pay "after application of deductible," the lesser of the limit of liability under the policy or the necessary amount actually spent to repair or replace the building on a functional replacement cost basis.  Section b.(2) then states that if the insured does "not make a claim under Paragraph (1) above," Liberty Mutual will pay, "after application of the deductible," the least of two amounts, including "the actual cash value of the damaged part of the building" or "the limit of liability under this policy that applies to the building."  Section b.(3) addresses how replacement cost will be paid when the insurance is less than 80% of the building's value, which it specifies to be paid "after application of deductible."  Section b.(3)(a).

Unlike the Base Policy and Home Protector Plus Endorsement, the FRCE clearly applies a deductible regardless of whether an FRCE claim is made for RCV or ACV.  Again, an

- 24 -

insurance policy is ambiguous only where there are competing reasonable policy interpretations. *Western Heritage Ins. Co. v. Asphalt Wizards*, 795 F.3d 832, 838 (8th Cir. 2015). It would be unreasonable to interpret the FRCE provisions applying to ACV payments as prohibiting application of a deductible when they specifically state, "after application of deductible." Plaintiffs offer no counter-argument.

The Court's finding that the FRCE does apply a deductible to ACV claims made under this endorsement does not impact its previous findings that a deductible may not be applied to ACV claims brought under the base policy or Home Protector Plus Endorsement. As evidenced by the previous analysis, the FRCE provision's language is self-contained and was interpreted based solely on its own terms. Therefore, in contrast to Liberty's contentions, the Court's finding with respect to the FRCE subclass does not conflict with the previous interpretations of the Base Policy and Home Protector Plus Endorsement.

### d. Other Allegedly Conflicting Provisions

In addition to the previous endorsements, Liberty points to other policy provisions within the Base Policy as evidence of its proffered interpretation that a deductible always applies unless explicitly stated otherwise. Liberty points to Additional Coverage No. 4 (Fire Department) and No. 6 (Credit Card), both of which are located under Section I – Property Coverages and provide:

| SECTION I – PROPERTY COVERAGES |
| --- |

**COVERAGE A – Dwelling**
. . .
**COVERAGE B – Other Structures**
. . .
**COVERAGE C – Personal Property**
. . .
**COVERAGE D – Loss of Use**
. . .
**ADDITIONAL COVERAGES**

. . .

**4. Fire Department Service Charge**. We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. . . .
*This coverage is additional insurance. No deductible applies to this coverage.*
. . .

**6. Credit Card, Fund Transfer Card, Forgery and Counterfeit Money**
We will pay up to $500 for:
a. The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in the "insured's" name . . .
*This coverage is additional insurance. No deductible applies to this coverage.*

[Doc. 73-1, p. 10 of 44 (Bond Policy) (emphasis added)].

Because these two additional coverages both explicitly provide, "No deductible applies," Liberty contends that this phrase's absence elsewhere in the policy and for other Additional Coverages sections must mean that a deductible does apply to ACV claims, in contrast to Plaintiffs' interpretation. The Court rejects this argument because policy language related to fire department services and credit card coverage, both of which fall under the "Additional Coverages" section, does not impact the loss settlement provisions of the policy related to ACV payments for Coverage A and B claims. Furthermore, Liberty does not include the language preceding the "no deductible applies" phrase, which states, "This coverage is additional insurance." The fact that Liberty decided to include these *additional* insurance coverages and not charge a deductible does not change the fact that the policy's loss settlement provisions for Coverage A and B claims (in the Endorsement's Section b.3.a. and the Base Policy's Section I – Conditions, 3.b.) do not allow a deductible to be subtracted from ACV payments. The "conflicting" provisions identified by Liberty Mutual apply to a type of coverage independent from coverage for A and B claims—coverage that falls under the "Additional Coverages" type of claims. As evidenced by the policy language, these "Additional Coverages" claims are settled differently than Coverage A and B claims and have their own requirements and limits, e.g., "up

- 26 -

to $500 for your liability . . . for fire department charges." Additional Coverages 4. Fire Department Service Charge.

As an additional argument against Plaintiffs' interpretation, Liberty points to the Coverage C (Personal Property) provisions in the Home Protector Plus Endorsement, which in relevant part provide:

> **A. INCREASED SPECIAL LIMIT OF LIABILITY – JEWELRY, WATCHES, FURS, PRECIOUS AND SEMI-PRECIOUS STONES**
>   Section I, Coverage C – Personal Property.  Special Limits of Liability.
>   Paragraph 5 is replaced with:
>   5. Jewelry, watches, furs, precious and semi-precious stones are insured for accidental direct physical loss or damage.  The following exclusions and limitations apply:
>     a. $2500 for loss by theft, subject to a maximum of $1000 for any one article.
>     b. The limit of liability stated in the declarations pages for Coverage C, for loss caused by perils named under Coverage C of this policy, other than theft.
>     c. $2500 for loss caused by perils not named and not excluded in this policy, subject to a maximum of $1000 for any article.
>     d. We do not cover loss or damage caused by mechanical breakdown, wear and tear, gradual deterioration, insects, vermin or inherent vice.

[Doc. 73-1, p. 23-24 (Bond Policy)].  Liberty emphasizes that Section A describes limits for certain personal property lost due to theft, without any regard to ACV or RCV.  Liberty reasons that if jewelry, watches, or furs are stolen from a dwelling, this loss is covered by insurance up to the limits specified in Section A and is subject to the deductible listed in the Declarations *because* this provision does not say anything about a deductible, much less explicitly exclude a deductible.  However, the policy's lack of clarity on how such Coverage C special items are settled and when a deductible applies does not clarify when a deductible does or does not apply under Coverage A or B claims in the endorsement.

As another example, Liberty explains that a fire may destroy part of a home (which can be settled at ACV or RCV), an awning (which can only be settled at ACV), certain personal

- 27 -

property (which can be settled at ACV, RCV, or an identified limit); and trees and shrubs (which can be settled at an identified limit only). Such a loss, with all of its separate coverages, is covered by insurance. This loss is also subject to a deductible. Liberty reasons that Plaintiffs' interpretation cannot be correct because it ignores the remaining policy language and how the policy works as a whole. Plaintiffs respond that the only language they seek to interpret is that in the Base Policy, Home Protector Plus Endorsement, and Wind/Hail Endorsement, not the additional types of property claims described by Liberty. The Court agrees. The question Plaintiffs ask this Court to decide is whether a deductible is applied to ACV payments for Coverage A or B claims brought under those portions of the policy.

In a footnote, Liberty Mutual cites this Court's decision in *Labrier v. State Farm and Casualty Co.*, 2015 WL 7738362, at *5 (W.D. Mo. Nov. 30, 2015). Liberty argues that because the Court noted that State Farm's insurance policy's "actual cash value means replacement cost minus depreciation," the Court cannot interpret the ACV provisions in Liberty's policy without reference to replacement cost, which as the Court has found, incorporates application of a deductible. *Id.* at *5. This argument does not change the Court's interpretation of Liberty's policy. First, in addition to involving contract provisions different from those in Liberty's policy, *Labrier* did not involve any dispute about whether deductibles were to be applied to ACV payments. *Id.* at 853, n. 5 ("There is no dispute that a deductible is also to be subtracted from the actual cash value payment."). Furthermore, calculating the ACV as replacement cost minus depreciation does not somehow transform an ACV payment into an RCV payment, as Liberty Mutual appears to argue; this is merely the formula that the insurance company uses to calculate what amount it will pay out for an ACV claim. The Court has already discussed the clear

- 28 -

difference between an ACV and RCV payment under Liberty's policy, and Liberty's citation to *Labrier* does not impact this finding.

For the previous reasons, the class is amended to exclude individuals with claims under the Back-Up Sewer Endorsement, Earthquake Endorsement, and FRCE Endorsement. Further, summary judgment is entered in favor of declaratory relief subclass members who have claims under the Home Protector Plus Endorsement or base policy.

### D. Wind/Hail Endorsement

Plaintiffs contend that the Wind/Hail endorsement does not alter when the deductible is applied but rather, affirms that a deductible is not applied to ACV claims. The relevant language from the Wind/Hail Endorsement is as follows:

> **The following special Deductible is added to the policy:**
> For the premium charged, we will pay only that part of the total of covered direct physical loss to property covered under Section I of this policy caused by Windstorm or Hail that exceeds the Windstorm or Hail Deductible as shown on the Declarations as follows:
> **A. When this Windstorm or Hail Deductible Applies**
> This Deductible applies in the event of direct physical loss to property covered under this policy caused directly or indirectly by the perils of Windstorm or Hail.
> . . .

[Doc. 73-1, p. 42 (Bond Policy)].

Plaintiffs argue that the phrase "total of covered direct physical loss to property" means the "total cost of repairing or replacing damaged property – i.e., the replacement cost." Plaintiffs' support for this interpretation is limited to a Liberty employee's testimony that "total amount of the loss" means "replacement cost" and Plaintiffs' conclusion that a reasonable insured would interpret this provision to refer only to replacement cost. [Doc. 75, p. 18-19]. The Court rejects this interpretation. Not only does this provision lack any reference to RCV or ACV, but interpreting this phrase requires interpreting the language's plain and ordinary

- 29 -

meaning, which Plaintiffs' interpretation fails to consider. The Court is only permitted to find an ambiguity if "duplicity, indistinctness, or uncertainty" arise in construing the language's plain meaning. Only then may the Court construe that ambiguity against the insured. *Fanning v. Progressive Northwestern Ins. Co.*, 412 S.W.3d 360, 364 (Mo. Ct. App. 2013). Plaintiffs, however, have not identified how this language is ambiguous, aside from pointing to an employee's testimony as evidence that their interpretation is correct. This is not enough. Further, Plaintiffs' interpretation wholly ignores the remainder of this provision, which, on its face, elucidates *when* this endorsement is applicable:

> For the premium charged, we will pay only that part of the total of covered direct physical loss to property *covered under Section I of this policy caused by Windstorm or Hail that exceeds the Windstorm or Hail Deductible*.

In contrast to Plaintiffs' interpretation, the Court finds that the provision's plain language clearly explains the requisite conditions for the endorsement to apply in the first place. First, there must be a direct physical loss to property covered under Section I. Second, that direct physical loss must be caused by wind or hail. And third, the total of this loss must be greater than the Wind/Hail Deductible, otherwise there would be no sense in applying the Wind/Hail Endorsement because the deductible would negate any recovery for the insured. "Direct physical loss to property covered under Section I," includes Section I – Property Coverages; Section I – Conditions; and Section I – Perils Insured Against, all contained within the base policy and Home Protector Plus Endorsement. Effectively, these are subparts of Section I, not separate sections. Because the Wind/Hail Endorsement refers to Section I of the policy, including multiple ways in which physical losses will be paid, not just losses under Coverage A and B for Dwellings and Other Structures, the phrase, "total of covered direct physical loss to property under Section I of this policy caused by Windstorm or Hail" does not mean replacement cost, as

argued by Plaintiffs.  Instead, an ordinary insured would understand that this phrase refers to the sum total of all direct physical losses caused directly or indirectly by wind or hail that are covered under Section I of the policy, including Coverage C losses.

Next, the Endorsement provides the circumstances under which the Wind/Hail special deductible is to be applied:

> **A. When this Windstorm or Hail Deductible Applies**
> This Deductible applies in the event of direct physical loss to property covered under this policy caused directly or indirectly by the perils of Windstorm or Hail.

A reasonable insured would understand this provision to mean that the Wind/Hail special deductible applies "in the event of direct physical loss to property."  In other words, if wind or hail causes, directly or indirectly, a physical loss to the insured's property, then the Wind/Hail special deductible will apply.  There is nothing ambiguous about this provision that would suggest the deductible applies only to RCV payments.

Even if the Court were to adopt Plaintiffs' proposed interpretation of "total of covered direct physical loss to property covered under Section I" as meaning "replacement cost," this interpretation would create unnecessary conflicts with the Wind/Hail Endorsement's application to "property covered under Section I of this policy."  For example, Coverage C within the Base Policy concerns personal property loss and provides for settling a personal property loss only at "actual cash value."  Therefore, if the Wind/Hail Endorsement applied only to replacement cost, as Plaintiffs contend, the endorsement could never apply to Coverage C losses caused by wind or hail, which is an unreasonable conclusion.

Accordingly, this conflict affirms that the "Section I" referred to by the Wind/Hail Endorsement means the sum total of all direct physical losses caused directly or indirectly by wind or hail that are covered under Section I of the policy, including Coverage C losses.  Thus,

the Court finds that a windstorm/hail deductible applies, even if the insured takes only an ACV payment and does not elect to submit a replacement cost claim. Liberty's motion for summary judgment as to the Wind/Hail Endorsement is therefore granted.

Because the Bonds, the only named plaintiffs, can no longer assert their declaratory relief claim, which arises under the Wind/Hail Endorsement, the Bonds are no longer adequate representatives of the declaratory relief subclass. *See* Fed. R. Civ. P 23(a)(4). Specifically, it is clear that, because the Bonds' declaratory relief claim is not viable, they no longer "possess the same interest" in litigating such claims as any remaining class members who seek to assert claims for declaratory relief only under the Home Protector Plus Endorsement or Base Policy. Nonetheless, the Bonds remain adequate class representatives for the injunctive relief subclass.

The fact that the Bonds' claim is no longer viable does not make this suit moot or necessarily undermine the claims of the remaining class members, as Liberty contends. Because a designated class has a status apart from that of the class representatives, dismissal of the class representatives' claims "does not inexorably require dismissal of the class action." *Smook v. Minnehaha County*, 457 F.3d 806, 815 (8th Cir. 2006). Therefore, rather than decertifying the class on the ground that the named plaintiffs are no longer adequate representatives, the better course is to afford plaintiffs' counsel a reasonable period of time for the substitution or intervention of a new class representative. As such, the Court will afford Plaintiffs an opportunity to submit a motion for the substitution or intervention of new named plaintiffs in this action within 30 days of the date of this Order.

### E. Injunctive Relief

In addition to seeking the declaratory relief discussed above, Plaintiffs also seek a permanent injunction "prohibiting Defendant from undertaking this improper conduct when

- 32 -

paying future claims." [Doc. 75, p. 22 of 25 (Plaintiffs' Suggestions in Support)]. This is the same requested relief that the Court addressed in its Order granting class certification. *See* [Doc. 66, p. 7]. This particular request for injunctive relief, however, is much narrower than the request in Plaintiffs' Amended Complaint, which Plaintiffs admit to having abandoned. *See* [Doc. 79, p. 14 of 21 (distinguishing the injunctive relief Plaintiffs currently seek from the relief sought in their Amended Complaint and conceding, "Plaintiffs clearly do not seek" that relief any longer)]. Because Plaintiffs have abandoned their much broader injunctive claims in their Amended Complaint, Liberty is correct that summary judgment must be granted as to those claims.[8] *See* [Doc. 27, ¶ 48 (b)-(d) (*"Amended Complaint"*)].

The Court next considers the merits of granting the more narrow permanent injunction sought by Plaintiffs. The Injunctive Relief Subclass is defined as:

> all persons with a dwelling or other structure located in the state of Missouri insured by Liberty Insurance Corporation under policy Form HO 03 (Edition 04 09) and endorsements at the time of class certification.

[Doc. 66, p. 12]. Based on the Court's previous findings, the injunction sought by Plaintiffs would prohibit Defendant from applying a deductible to Coverage A or B claims brought only under the Base Policy or Home Protector Plus Endorsement.

As a preliminary matter, Liberty opposes this injunction, contending that it has changed its policy's loss settlement and deductible language as of April 17, 2017 for new policies and as of June 15, 2017 for renewal policies. For example, the Base Policy has been amended to state:

> **Deductible.** In case of loss under **Section I – Property Coverages** of this policy, we cover only that part of the loss over the applicable deductible stated in your Policy Declarations.

---

[8] However, the Court cannot grant summary judgment on these abandoned claims until it ensures that the injunctive relief subclass complies with Fed. R. Civ. P. 23. Therefore, the Court declines to rule on these claims until the adequacy of the class representatives has been resolved. *See* discussion *infra.*

Because of these recent policy revisions, the Court cannot award an injunction to the injunctive relief subclass as it is currently defined because not all members will have the same underlying policy language at the time the Court rules, and thus, an injunction cannot apply to all members of the class. In addition, Liberty argues that the class definition's restriction to policyholders "at the time of class certification" means that it could potentially include class members who are *former* policyholders and thus, lack standing to seek injunctive relief.

Accordingly, there are two problems with the class definition as it is currently defined. Nonetheless, as Plaintiffs argue, these problems are easily resolved because the Court may amend the definition of the injunctive relief subclass. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). Therefore, the Court will amend the Injunctive Relief Subclass to reflect the following italicized revisions:

> **Injunctive Relief Subclass:** all persons with a dwelling or other structure located in the state of Missouri insured by Liberty Insurance Corporation under policy Form HO 03 (Edition 04 09) and endorsements at the time of *the Court's Order granting injunctive relief. Excluded from this subclass are: (1) those insureds who opened new Liberty policies written on or after April 17, 2017, and (2) those insureds who renewed their Liberty policies on or after June 15, 2017.*

The Court's amended definition resolves Liberty's contention that this subclass could improperly include former policyholders by requiring the class members to be insured at the time of the Court's order granting injunctive relief. It also resolves Liberty's contention that the class would include policyholders with different policy language by excluding those insureds from the class, as conceded to by Plaintiffs. *See* [Doc. 84, p. 4 of 11 (Plaintiffs proposing that the Court "amend the definition of the injunctive relief subclass at the time it enters an injunction to include policyholders with the HO 03 (Edition 04 09) policy containing the language at issue here")].

- 34 -

As a separate preliminary argument, Liberty challenges the Bonds' adequacy as class representatives for the injunctive relief subclass. For the first time in its Reply, Liberty asserts that the Bonds cannot represent the injunctive relief subclass because they have not had a current policy with Liberty since even prior to the Court's May 1, 2017 Class Certification order. [Doc. 66]. Liberty contends that the Bonds cancelled their homeowner's policy with Liberty on December 16, 2016. *See* [Doc. 83, p. 9 of 11 and n. 3].

As a general rule, the Court does not consider arguments raised for the first time in a reply brief. *Bearden v. Lemon*, 475 F.3d 926, 930 (8th Cir. 2007). However, because Liberty's argument challenges the satisfaction of a fundamental class certification requirement, *see* Fed. R. Civ. P. 23(a)(4), this argument must be addressed before the Court can rule on the merits of this subclass's injunctive relief claim.[9] Therefore, the Court will permit Plaintiffs 20 days to respond. If no response is filed by this deadline, the injunctive relief subclass will be decertified for lack of an adequate representative, as required by Federal Rule of Civil Procedure 23(a)(4).

### III.    Conclusion

For the reasons set forth above, Plaintiffs' and Defendant's motions for summary judgment are granted in part and denied in part. Summary judgment is granted in favor of Defendant as to the Wind/Hail Endorsement. Summary judgment is granted in favor of Plaintiffs

---

[9] If the Bonds are not currently insured under the policy at issue, they have no risk of suffering the requisite imminent threat of a future injury. As a result, the Bonds have always lacked standing and continue to lack standing to seek injunctive relief and cannot represent the injunctive relief subclass. Therefore, if Liberty's argument is true, the injunctive relief subclass has never had an adequate class representative, as is required for certification. Nonetheless, the Court is unwilling to accept such an argument without permitting Plaintiffs an opportunity to respond.

- 35 -

for their Coverage A and B claims under the Base Policy and Home Protector Plus Endorsement. In addition, the class definition is amended as discussed above.

Rather than decertifying the class on the ground that the named plaintiffs are no longer adequate representatives of the declaratory relief subclass, the Court affords Plaintiffs an opportunity to submit a motion for the substitution or intervention of new named plaintiffs in this action within 30 days of the date of this Order. In addition, Plaintiffs have 20 days to respond to Liberty's argument that the Bonds are no longer insured under the policy.


/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 24, 2017
Jefferson City, Missouri